UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRANDON COX,

                              Plaintiff,

        v.

THE VILLAGE OF PLEASANTVILLE,
NEW YORK, POLICE OFFICER AARON
HESS,

                              Defendants.

No. 11-CV-6516 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Jonathan S. Abady, Esq.
Ogilvie A. F. Wilson, Esq.
Debra L. Greenberger, Esq.
Emery Celli Brinckerhoff & Abady, LLP
New York, NY
*Counsel for Plaintiff*

Charles J. Ogletree, Jr., Esq.
Harvard Law School
Cambridge, MA
*Counsel for Plaintiff*

Robert Johnson, Esq.
Boston, MA
*Counsel for Plaintiff*

Caitlin G. Scheir, Esq.
Gaines, Gruner, Ponzini & Novick, LLP
White Plains, NY
*Counsel for Defendant the Village of Pleasantville, New York*

James A. Randazzo, Esq.
Portalae Randazzo LLP
White Plains, NY
*Counsel for Defendant the Village of Pleasantville, New York*

Brian S. Sokoloff, Esq.
David A. Gold, Esq.
Leo Dorfman, Esq.
Sokoloff Stern LLP
Carle Place, NY
Westbury, NY
*Counsel for Defendant Police Officer Aaron Hess*

KENNETH M. KARAS, District Judge:

Plaintiff Brandon Cox filed this suit against Defendants the Village of Pleasantville, New York; the Town of Mount Pleasant, New York; Police Officer Aaron Hess; Police Officer Ronald Beckley; Police Officer Ronald Gagnon; the County of Westchester; and John Does # 1–30, alleging violations of his constitutional and state law rights arising out of an incident in the evening on October 16, 2010 in which Plaintiff was shot in the arm by Defendant Aaron Hess. (*See* Compl. (Dkt. No. 1).)  The claims against Defendants Town of Mount Pleasant, Ronald Beckley, and Ronald Gagnon were resolved by way of an offer of judgment pursuant to Federal Rule of Civil Procedure 68.  (*See* Dkt. No. 17.)  The claims against the County of Westchester were voluntarily dismissed by stipulation.  (*See* Dkt. No. 107.)  Before the Court are Defendants Aaron Hess's and the Village of Pleasantville's (collectively, "Defendants") Motions for Summary Judgment.  (*See* Dkt. Nos. 110, 113.)  For the following reasons, the Motions are granted in part and denied in part.

## I.  Background

### A.  Factual Background

In resolving Defendants' Motions for Summary Judgment, the Court will recite only either undisputed facts or those set forth by Plaintiff and supported by the record.  The Court will not, except as noted, set forth Defendants' version of the facts where disputed.

<u>1. Football Game and Finnegan's</u>

In October 2010, Plaintiff was a junior at Stonehill College in Massachusetts. (*See* Decl. of Debra L. Greenberger ("Greenberger Decl.") Ex. 1 ("Cox Dep.") 360, 422–23 (Dkt. No. 119); *see also* Pl. Brandon Cox's Statement of Additional Disputed Facts Pursuant to Local Rule 56.1(B) ("Pl.'s 56.1") ¶ 2 (Dkt. No. 121); Def. Aaron Hess' Resp. to Pl.'s Statement of Additional Facts Pursuant to Local Civil Rule 56.1 ("Def.'s 56.1 Resp.") ¶ 2 (Dkt. No. 127).) On October 16, 2010, Plaintiff was in Westchester County to play in a homecoming football game against Pace University, where his best friend from high school, D.J. Henry, also played football. (*See* Cox Dep. 38–41; *see also* Pl.'s 56.1 ¶ 3; Def.'s 56.1 Resp. ¶ 3.) Brandon, D.J., and their families went out to dinner after the game, (*see* Cox Dep. 43–44; *see also* Pl.'s 56.1 ¶ 4; Def.'s 56.1 Resp. ¶ 4), after which Brandon, D.J., and some of D.J.'s friends went to Finnegan's, a restaurant and bar in Mount Pleasant, New York, (*see* Cox Dep. 52–53; *see also* Pl.'s 56.1 ¶ 5; Def.'s 56.1 Resp. ¶ 5).

Around 1:10 AM, after an incident involving some patrons of Finnegan's unrelated to Plaintiff or his friends, Stephen Van Ostrand, the owner of Finnegan's, turned the lights up and informed all of the patrons in Finnegan's (including Plaintiff and D.J.) that they would have to leave. (*See* Greenberger Decl. Ex. 5 ("Van Ostrand Dep.") 186–92; *see also* Pl.'s 56.1 ¶ 6; Def.'s 56.1 Resp. ¶ 6.) Van Ostrand directed the bartender, Robert Nugent, to call the Mount Pleasant Police to ask for assistance with the unruly patrons that had been the cause of the disturbance, and Nugent did so. (*See* Van Ostrand Dep. 187–88; *see also* Def. Aaron Hess' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Def.'s 56.1") ¶ 18 (Dkt. No. 116); Pl.'s Resp. to Def. Hess's Local Rule 56.1 Statement ("Pl.'s 56.1 Resp.") ¶ 18 (Dkt. No. 120).) Desmond Hinds, one of D.J.'s friends present that night, estimated that at the

time the lights came on, there were approximately 50 to 70 people at Finnegan's. (*See* Greenberger Decl. Ex. 2 ("Hinds Dep.") 616; *see also* Pl.'s 56.1 Resp. ¶ 20.)

### 2. Arrival of Police

At all relevant times, Aaron Hess was a member of the Village of Pleasantville Police Department. (*See* Decl. in Supp. of Mot. for Summ. J. ("Sokoloff Decl.") Ex. A ("Hess Dep.") 45–46 (Dkt. No. 114); *see also* Def.'s 56.1 ¶ 23; Pl.'s 56.1 Resp. ¶ 23.) Around 1:20 AM, the Town of Mount Pleasant Police Department sent out a radio dispatch requesting units to respond to a fight in progress at Finnegan's, (*see* Sokoloff Decl. Ex. M, at MP 001786; Sokoloff Decl. Ex. N; *see also* Def.'s 56.1 ¶ 25; Pl.'s 56.1 Resp. ¶ 25), though subsequent dispatches sent less than two minutes later clarified that there were "no fights in progress" and the "place [was] clearing out," (*see* Sokoloff Decl. Ex. M, at MP 001786; *see also* Pl.'s 56.1 Resp. ¶ 25).

Hess heard the dispatches requesting assistance at Finnegan's and drove toward one of the entrances of the Thornwood Shopping Center, where Finnegan's was located, (*see* Hess Dep. 110, 114; *see also* Def.'s 56.1 ¶¶ 26–27; Pl.'s 56.1 Resp. ¶¶ 26–27). Upon viewing the crowd in front and around Finnegan's, Hess pulled into the shopping center, (*see* Hess Dep. 119, 134; Def.'s 56.1 ¶ 30; Pl.'s 56.1 Resp. 30), and radioed the Pleasantville Police Department and instructed the desk officer to notify the Mount Pleasant Police Department of a large crowd in front of Finnegan's, (*see* Hess Dep. 126; Sokoloff Ex. M, at MP 001786; Sokoloff Ex. W ("Gilmartin Dep.") 30–31; *see also* Def.'s 56.1 ¶ 31; Pl.'s 56.1 Resp. ¶ 31).

Hess parked his police vehicle in the roadway in front of Finnegan's, (*see* Hess Dep. 121–22; *see also* Def.'s 56.1 ¶ 32; Pl.'s 56.1 Resp. ¶ 32), and sometime thereafter exited the vehicle, (*see* Hess Dep. 123–24, 712; Def.'s 56.1 ¶ 34; Pl.'s 56.1 Resp. ¶ 34). Officer Carl Castagna, a member of the Mount Pleasant Police Department, arrived on the scene next and

parked his police vehicle behind Hess's. (*See* Hess Dep. 124–25; Sokoloff Decl. Ex. Y ("Castagna Dep.") 54; *see also* Def.'s 56.1 ¶¶ 35–36; Pl.'s 56.1 Resp. ¶¶ 35–36.) Officer Castagna exited his vehicle and joined Hess. (*See* Hess Dep. 127; Castagna Dep. 56–57, 64; *see also* Def.'s 56.1 ¶ 37; Pl.'s 56.1 Resp. ¶ 37.) After Officer Castagna, Pleasantville Police Department Officer Kevin Gilmartin arrived on the scene, parked his car behind Officer Castagna's vehicle, and exited his vehicle. (*See* Hess Dep. 138–39; Gilmartin Dep. 54–57; *see also* Def.'s 56.1 ¶¶ 38–39; Pl.'s 56.1 Resp. ¶¶ 38–39.) After Officer Gilmartin, Mount Pleasant Police Department Officer Justin Jacobsen arrived at the scene, parked behind Gilmartin's vehicle, and exited his vehicle. (*See* Sokoloff Decl. Ex. V ("Jacobsen Dep.") 85–87; Castagna Dep. 68; *see also* Def.'s 56.1 ¶¶ 40–41; Pl.'s 56.1 Resp. ¶¶ 40–41.)

The Parties dispute the nature of the scene when the police officers arrived. (*See, e.g.*, Def.'s 56.1 ¶¶ 43–45; Pl.'s 56.1 Resp. ¶¶ 43–45.) Hess testified that the crowd around Finnegan's was generally walking toward the parking lot, but noted that there were also people dispersing toward the sidewalk area across from where his vehicle was parked. (*See* Hess Dep. 129.) Hess did not recall feeling threatened by anything going on. (*See id.* at 213.) Officer Castagna did not see any fighting, (*see* Castagna Dep. 54–55, 60–63), and Officer Gagnon, another officer at the scene, did not see any violent activity, (*see* Sokoloff Decl. Ex. UU, at 187–88). Other witnesses, however, described the scene as "chaotic," and Officer Gilmartin described that "[t]here were people yelling and screaming and arguing throughout the entire parking lot and up onto the sidewalk by Finnegan's." (Gilmartin Dep. 136.) Hess and Castagna believed that a number of patrons leaving Finnegan's were intoxicated and were slurring their speech, (*see* Hess Dep. 127–28, 217–18; Castagna Dep. 442–43; *see also* Def.'s 56.1 ¶¶ 50–51; Pl.'s 56.1 Resp. ¶¶ 50–51), but could not have been certain that any individuals were actually

drunk, (*see* Pl.'s 56.1 Resp. ¶ 50). Hess witnessed at least five individuals acting in an aggressive manner, (*see* Hess Dep. 116), and Officer Gilmartin saw two individuals being separated so that they would not fight, (*see* Gilmartin Dep. 139). Because there is some dispute of fact, the Court will assume, at this stage, that Plaintiff's account, which details a largely peaceful and orderly exit from Finnegan's with only scattered pockets of minor disturbances, is more accurate.

For some period of time, Hess and Officer Castagna remained near their vehicles watching the crowd exit Finnegan's and disperse. (*See* Hess Dep. 122, 128–31, 143–44; Castagna Dep. 61; *see also* Def.'s 56.1 ¶¶ 46–47; Pl.'s 56.1 Resp. ¶¶ 46–47.) Van Ostrand eventually came out of Finnegan's and approached Hess and Castagna. (*See* Hess Dep. 140, Castagna Dep. 64–65, 68; Van Ostrand Dep. 49, 221; *see also* Def.'s 56.1 ¶ 55; Pl.'s 56.1 Resp. ¶ 55.) Van Ostrand told the officers that he just wanted the patron who had caused the disturbance to get out of there, although Van Ostrand noted that none of the officers took any action with respect to that comment. (*See* Van Ostrand Dep. 205–06.) Van Ostrand estimated that he spoke with the officers for about thirty seconds or a minute, and testified that he told the officers he wanted to "get everybody out of [t]here safely." (*Id.* at 206–07.) Around this time, Castagna dispatched over his radio, "respond with caution, only verbal at this time," (Greenberger Decl. Ex. 4 ("Beckley Dep.") 193; *see also* Pl.'s 56.1 ¶ 9; Def.'s 56.1 Resp. ¶ 9), which Officer Ronald Beckley, another police officer on his way to the scene, understood to mean that there was "no physical activity, no fighting going on," (Beckley Dep. 194).

### 3. Plaintiff and D.J.'s Departure

Plaintiff and D.J., who by this time had exited Finnegan's, got into D.J.'s car in the parking lot and pulled up to the curb in front of Finnegan's to wait for their friends—D.J. was

driving and Cox was in the front passenger seat. (*See* Cox Dep. 213–14; *see also* Pl.'s 56.1 ¶ 11; Def.'s 56.1 Resp. ¶ 11.) The curb where they stopped was marked as a fire lane. (*See* Cox Dep. 213–14; *see also* Pl.'s 56.1 ¶ 11; Def.'s 56.1 Resp. ¶ 11.) Hinds soon joined them and sat in the backseat; the three stayed in the fire lane awaiting the rest of their friends. (*See* Cox Dep. 202–03; *see also* Pl.'s 56.1 ¶ 11; Def.'s 56.1 Resp. ¶ 11.) While Plaintiff was looking at his smartphone, he heard a "thump" on the driver's-side window. (*See* Cox Dep. 214, 218–20; *see also* Pl.'s 56.1 ¶ 12; Def.'s 56.1 Resp. ¶ 12.) Plaintiff turned and saw Officer Gagnon motioning with his hands, which Cox and Hinds both interpreted as a direction to move out of the fire lane. (*See* Cox Dep. 218–20; Hinds Dep. 191.) D.J. moved his car in response to the apparent direction. (*See* Cox Dep. 221, 301; *see also* Pl.'s 56.1 ¶ 13; Def.'s 56.1 Resp. ¶ 13.)

The record is unclear as to what speed D.J. drove the car away. Plaintiff testified that the vehicle travelled at "regular parking lot speed." (Cox Dep. 274–75.) He also testified, however, that the speed of the vehicle was probably somewhere between 5 and 20 mph. (*See* Cox Dep. 275.) Hinds testified that the car travelled "slowly," (Hinds Dep. 198), but told the police that the vehicle was moving at a "decent" speed, (Decl. in Further Supp. of Mot. for Summ. J. ("Reply Decl.") Ex. HHH (Dkt. No. 125)). Plaintiff's accident reconstruction expert, Gregory Witte, estimated that D.J.'s vehicle reached a speed of approximately 17.3 mph. (*See* Greenberger Decl. Ex. 11 ("Witte Revised Report") 13.) As Witte's calculation, provided by Plaintiff, is the only speed estimated with any precision, the Court will presume, for purposes of this Motion, that D.J.'s vehicle reached a top speed of approximately 17.3 mph as it pulled away from the fire lane.

4.  Collision with Hess

As Hess was talking to Van Ostrand, Hess's attention was drawn to D.J.'s vehicle.  Hess

testified that he heard an engine rev, (*see* Hess Dep. 152), an account corroborated by the

testimony of Officer Gilmartin, Officer Castagna, Officer Jacobsen, and Van Ostrand, (*see* Van

Ostrand Dep. 10; Jacobsen Dep. 123, 514; Gilmartin Dep. 146; Castagna Dep. 424).  Cox and

Hinds, however, denied that the car made any sound when D.J. pulled away from the fire lane,

(*see* Cox Dep. 234; Hinds Dep. 203), and Officer Beckley, who was on the scene by this time,

did not hear any engine revving, (*see* Beckley Dep. 19, 423–24).  Because there is a dispute of

fact, the Court assumes at this stage that D.J.'s car made no distinct engine revving sound when

it pulled out of the fire lane.  At any rate, Hess saw D.J.'s car moving, though he admitted he did

not see whether it had been parked in the fire lane.  (*See* Hess Dep. 145–47.)

The stories of the various witnesses diverge somewhat significantly at this point.  The

Court will relay Plaintiff's (the nonmovant's) version of the incident, with the understanding that

Defendants dispute many of these facts.  As the vehicle pulled around a curve in the road in the

parking lot, Plaintiff saw Hess "running from in between two cop cars with his gun in his

hand[s]."  (Cox Dep. 235.)  Hess was running into the roadway toward D.J.'s vehicle (which was

in motion by this time).  (*See id.* at 240.)[1]  After Hess ran into the roadway, Cox felt the car slow

---

[1] According to Hess, he moved into the roadway because he saw the vehicle knock
Officer Gagnon off balance and because he heard Officer Gagnon yell, "Stop that vehicle" or
"Stop that car."  (Hess Dep. 145.)  Plaintiff disputes that the vehicle knocked Officer Gagnon off
balance or that he yelled after the vehicle, (*see* Pl.'s 56.1 Resp. ¶¶ 60–61), and the Court must
construe these disputed facts in Plaintiff's favor.  Defendants contend that the fact "[t]hat
Plaintiff did not hear [Officer Gagnon yell] does not mean it didn't happen," (*see* Reply Mem. of
Law in Supp. of Def. Aaron Hess' Mot. for Summ. J. 7 (Dkt. No. 128)), but for purposes of these
Motions, that is precisely what it means—the only way Plaintiff can contest Hess's testimony
that he heard Officer Gagnon yell after the vehicle is to offer testimony that no such exclamation
was made.  Plaintiff has done so, (*see, e.g.*, Cox Dep. 234–35), and that suffices at this stage.

down "almost to a complete stop." (Greenberger Decl. Ex. 9 ("Cox 50-h Testimony") 71; *see also* Hinds Dep. 229.) Witte estimated that as the vehicle pulled around the curve, it decelerated from 17.3 mph to 6.1 mph, before accelerating back to 8.16 mph, (*see* Witte Revised Report 13), although he testified at his deposition that because of some issues with the quality of the security video he reviewed, it was more likely that the vehicle decelerated from 17.3 mph to about 10 mph, without any subsequent acceleration during the time the vehicle was in view of the security camera, (*see* Greenberger Decl. Ex. 7, at 80–81).

Plaintiff testified that after Hess ran in front of the vehicle and as the vehicle was slowing down, Hess fired a shot at the vehicle. (*See* Cox Dep. 242–44; Cox 50-h Testimony 71–72.) Plaintiff's account is corroborated by the testimony of Hinds, (*see* Greenberger Decl. Ex. 10, at 60), Officer Beckley, (*see* Beckley Dep. 23–24), and Officer Jacobsen, (*see* Jacobsen Dep. 377–78), who all testified that they heard a shot before Hess came into contact with the hood of the vehicle. Defendants object that no one testified that Hess actually fired a shot *at the vehicle* before he came into contact with the vehicle, (*see* Def.'s 56.1 Resp. ¶ 23 n.13), but Plaintiff testified that he heard a shot go off as Hess had his weapon held up and pointed at the vehicle, (*see* Cox 50-h Testimony 70–72). And, in any event, the remainder of the testimony does not indicate in which direction the shot was fired, and a jury would not be required to accept Defendants' theory that the shot was fired in some direction other than toward the vehicle. The Court notes also that Witte testified as to his belief that Hess did not fire before he made contact with the vehicle, (*see* Reply Decl. Ex. NNN, at 72), but as the Court must construe all disputed facts in Plaintiff's favor, the Court will assume at this stage that Hess first fired at the vehicle before he made contact with the hood. Plaintiff additionally testified that he ducked down in his seat to avoid further shots. (*See* Cox Dep. 242–43; Cox 50-h Testimony 73–74.)

9

After the first shot was fired, and while he was ducking down, Plaintiff heard a "thud" on the hood of the vehicle. (*See* Cox 50-h Testimony 73–74.) Plaintiff looked up and saw Hess on the hood firing his weapon. (*See* Cox Dep. 244, 414.) One non-party witness stated that Hess had "jump[ed] onto the hood," (Greenberger Decl. Ex. 8 ("Scott Dep.") 37), and Officer Beckley testified that Hess had "mount[ed] the vehicle as he was firing," (Beckley Dep. 22–23). While on the hood of the vehicle, Hess reached up with his left hand and grabbed the space at the top of the hood. (*See* Hess Dep. 187; *see also* Def.'s 56.1 ¶ 81; Pl.'s 56.1 Resp. ¶ 81.) Hess testified that it was his belief that he would be killed if the car did not come to a stop, (*see* Hess Dep. 402, 440), though Plaintiff disputes that such a belief was reasonable, (*see* Pl.'s 56.1 Resp. ¶ 84). Hess shot a total of four times in an effort to stop the driver of the vehicle. (*See* Hess Dep. 504, 803.)

Witte's expert report estimated that about 1.0–1.3 seconds passed between when Hess stepped in front of the vehicle and when it collided with him. (*See* Witte Revised Report 20.) According to Witte, the average reaction time in normal circumstances is approximately 1.6 seconds, and 2.9–3.6 seconds in the specific circumstances here. (*See id.* at 20–22.) Under either scenario, Witte opined that D.J. did not have enough time to stop the vehicle before colliding with Hess. (*See id.* at 22.) Witte estimated that the speed of the vehicle when it collided with Hess was no more than 5 mph (assuming Hess lunged at the vehicle), (*see id.* at 16–20), or less than 5 mph (assuming Hess was stationary), (*see* Greenberger Decl. Ex. 12).

While Hess was on the hood of the vehicle, Officer Beckley, a 30-year police veteran who had arrived on the scene shortly after Hess, heard the first shot and turned to see a then-unknown figure (whom the Parties now agree was Hess) mounting a vehicle as he was firing his weapon. (*See* Beckley Dep. 22–23; *see also* Pl.'s 56.1 ¶ 31; Def.'s 56.1 Resp. ¶ 31.) Officer

Beckley, believing the person on the hood to be the aggressor, drew his weapon and fired at Hess. (*See* Beckley Dep. 28–29; *see also* Pl.'s 56.1 ¶ 32; Def.'s 56.1 Resp. ¶ 32.)

As Hess shot through the windshield of the vehicle, one of the bullets struck Plaintiff in the arm. (*See* Cox Dep. 245; Cox 50-h Testimony 15.) Multiple bullets struck D.J. (*See* Pl.'s 56.1 ¶ 42; Def.'s 56.1 Resp. ¶ 42.) Hess testified that he could not see the faces of anyone in the vehicle and was merely aiming at the silhouette of the figure driving the vehicle. (*See* Hess Dep. 165.) Hess also claimed that he did not know if there were any passengers. (*See id.* at 166.) Plaintiff disputes this account, arguing that a jury could discredit Hess's claim that he could not see the driver or the passengers, given that there has been no explanation (condensation, fog, tinted windows, etc.) for his inability to see through the front windshield of the vehicle. (*See* Pl.'s 56.1 Resp. ¶¶ 95, 99.) Plaintiff also points out that one of the bullet holes appears to be closer to the passenger side, and thus may indicate that Hess was aware that a passenger was in the vehicle and fired his weapon in that direction as well. (*See id.* ¶ 95.)

After the first shot was fired, the vehicle began to accelerate. (*See* Cox Dep. 245–46; *see also* Pl.'s 56.1 ¶ 39; Def.'s 56.1 Resp. ¶ 39.) At some point after the shooting began and after the vehicle accelerated, the vehicle swerved, hit a police vehicle, and came to a stop. (*See* Hess Dep. 168; Cox Dep. 245–46; Jacobsen Dep. 119; *see also* Pl.'s 56.1 ¶ 39; Def.'s 56.1 Resp. ¶ 39.) According to Witte, D.J.'s vehicle reached a top speed of approximately 24 mph on its way to the collision with the police vehicle. (*See* Witte Revised Report 11.)[2]

---

[2] In Plaintiff's response to Defendants' 56.1 statement, he claims that Witte disputed that the car ever reached a speed of 24.1 miles per hour. (*See* Pl.'s 56.1 Resp. ¶ 109.) But the deposition testimony cited by Plaintiff relates to the speed of the car "[a]t the point where it interacted with Officer Hess," (Greenberger Decl. Ex. 7, at 245), and in any event, Witte concludes in his report that "the police results of 24 mph [were] a fair representation of the speed of [D.J.'s vehicle] as it passed by the [security] camera," (Witte Revised Report 11).

After the vehicle stopped, Hess "fell to the ground." (Scott Dep. 78.) Hess landed on the roadway and rolled toward the median. (*See* Hess Dep. 191; *see also* Def.'s 56.1 ¶¶ 115–16; Pl.'s 56.1 Resp. ¶¶ 115–16.) Hess radioed dispatch and relayed, "You got to call a hotline, you got to get everyone over here, I got hit by a car." (Sokoloff Decl. Ex. M; Sokoloff Decl. Ex. GGG; *see also* Def.'s 56.1 ¶ 117; Pl.'s 56.1 Resp. ¶ 117.) As a result of the incident, Hess's knee was injured. (*See* Hess Dep. 191, 659; *see also* Def.'s 56.1 ¶ 118; Pl.'s 56.1 Resp. ¶ 118.)

Meanwhile, Plaintiff, who had been crouched near the door to protect his body, looked up. (*See* Cox Dep. 245, 288–89; *see also* Pl.'s 56.1 ¶ 40; Def.'s 56.1 Resp. ¶ 40.) D.J. told Plaintiff and Hinds, "They shot me. They shot me." (Cox Dep. 291; Cox 50-h Testimony 75; Hinds Dep. 309; *see also* Pl.'s 56.1 ¶ 41; Def.'s 56.1 Resp. ¶ 41.) Indeed, D.J. had been shot multiple times, and he thereafter died from his wounds. (*See* Hess Dep. 165; Hinds Dep. 309, 377; *see also* Pl.'s 56.1 ¶ 42; Def.'s 56.1 Resp. ¶ 42.)

### 5. Additional Allegations

There are some additional allegations raised by Plaintiff that warrant attention. First, Plaintiff points out that at the time Hess ran into the roadway in front of the vehicle, Hess had no knowledge or belief that the driver of the vehicle had committed a crime or that any criminal activity was afoot. (*See* Pl.'s 56.1 ¶ 27.) Defendants object to this statement of fact, (*see* Def.'s 56.1 Resp. ¶ 27), but Plaintiff has supported his contention with citations to the record indicating that Hess was not "aware of any criminal behavior going on in [the] parking lot" at the time, (Hess Dep. 179). The Court will thus assume at this stage that Hess had no reason to believe the vehicle or its occupants (all located in the parking lot) were engaged in criminal activity.

Plaintiff also cites to a number of police policies regarding the use of deadly force against a moving vehicle, (*see* Pl.'s 56.1 ¶¶ 34–38), the existence of which are undisputed by

Defendants, (*see* Def.'s 56.1 Resp. ¶¶ 34–38). But even assuming all of these policies, some of which apply only to New York City police officers, are applicable to the facts at hand, the Court agrees with Defendants that their relevance is in doubt. (*See, e.g.*, Def.'s 56.1 Resp. ¶ 34 & n.19.) As far as the Court is aware, and as far as Plaintiff has argued, there is nothing illegal or constitutionally impermissible about failing to comply with department policy. Internal policy may very well go above-and-beyond the bare-minimum requirements imposed by law, and a police officer is not more or less liable based on his or her compliance with departmental policy. *See Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998) ("A violation of state law neither gives [a] plaintiff a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim. Without more, the fact that [the] defendants violated New York procedural requirements does not support liability under § 1983." (alterations, citation, and internal quotation marks omitted)); *see also Rivera v. Madan*, No. 10-CV-4136, 2013 WL 4860116, at *8 n.7 (S.D.N.Y. Sept. 12, 2013) ("[T]he issue here is not whether [the] [d]efendants violated a DOCCS policy, but rather whether conducting the body cavity search violated [the plaintiff's] constitutional rights."). Thus, while the Court will accept as true the existence of these policies, they will not be relied on in deciding these Motions.

### B. Procedural History

Plaintiff filed the Complaint on September 19, 2011, naming as Defendants the Village of Pleasantville, the Town of Mount Pleasant, Officer Hess, Officer Beckley, Officer Gagnon, the County of Westchester, and John Does # 1–30. (*See* Compl. (Dkt. No. 1).) This case is one of several arising out of the events of October 16, 2010 and has been accepted as related to 11-CV-2707 (D.J.'s family's case against Hess and the Village of Pleasantville). On October 24, 2011, all Defendants except the County of Westchester filed their Answers, (*see* Dkt. Nos. 10–11, 13);

the County of Westchester filed its Answer on April 13, 2012, (*see* Dkt. No. 28). The Action was consolidated for discovery purposes with a number of other cases arising out of the events of October 16, 2010. (*See* Order (Dkt. No. 16).) On December 7, 2011, partial final judgment was entered on consent in the amount of $100,000 against Defendants Town of Mount Pleasant, Officer Beckley, and Officer Gagnon. (*See* Dkt. No. 17.) The judgment also disposed of the claims against John Does # 11–20. (*See id.*)

Discovery thereafter proceeded. Due partly to the consolidation of discovery with other cases, and partly to the sheer number of witnesses and experts involved, discovery was extended on request of the Parties several times. (*See, e.g.*, Dkt. Nos. 32, 53, 54, 63, 70, 84, 89.) Discovery has now finally concluded, however, and on September 30, 2016, Plaintiff wrote the Court requesting a pretrial conference to discuss any proposed motions. (*See* Dkt. No. 94.) On October 11 and 12, 2016, the remaining Defendants filed premotion letters requesting leave to file motions for summary judgment. (*See* Dkt. Nos. 99, 101, 102.) On November 9, 2016, the Court held a premotion conference wherein it set a briefing schedule for the proposed motions and counsel for Plaintiff expressed their intention to stipulate to dismissal of the claims against the County of Westchester, (*see* Dkt. (minute entry for Nov. 9, 2016)); a stipulation to that effect was entered the same day, (*see* Dkt. No. 107).

Pursuant to the briefing schedule, (*see* Dkt. No. 108), the remaining Defendants (Hess and the Village of Pleasantville) each filed their Motions for Summary Judgment and accompanying papers on January 9, 2017, (*see* Dkt. Nos. 110–116). In its memorandum of law, the Village of Pleasantville acknowledged that if Hess is found liable under state law for assault and battery, it would be liable under a theory of respondeat superior. (*See* Dkt. No. 112.) On February 17, 2017, Plaintiff filed his opposition. (*See* Dkt. Nos. 119–22.) On March 15 and 16,

2017, Hess filed his reply papers, (*see* Dkt. Nos. 127–28), and the Village of Pleasantville filed a letter on March 17, 2017 indicating that it would not file reply papers, (*see* Dkt. No. 129).

<u>II.  Discussion</u>

<u>A.  Standard of Review</u>

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

 "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts

showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires

a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal quotation marks omitted)).

### B.  Analysis

Plaintiff's remaining causes of action against Defendants are for violations under the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 and for assault and battery under New York state law.  (*See* Dkt. No. 104.)  The Court will address each claim in turn.

#### 1.  Fourth Amendment Seizure

##### a.  Applicable Law

The Fourth Amendment proscribes unreasonable searches and seizures.  *See* U.S. Const. amend. IV.  A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied."  *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (emphasis and internal quotation marks omitted).  However, the Fourth Amendment "permits brief investigative stops—such as [a] traffic stop . . . —when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (internal quotation marks omitted).  "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[*A*]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest,

investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . .").  The Second Circuit has held that "[i]t is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003).

### b.  Seizure of Plaintiff

Defendants first argue that Plaintiff's claim for a Fourth Amendment violation fails at the starting line because Hess never seized Plaintiff.  (*See* Mem. of Law in Supp. of Def. Aaron Hess' Mot. for Summ. J. ("Def.'s Mem.") 12 (Dkt. No. 115).)  Specifically, Defendants argue that no seizure was effected because D.J. did not comply with Hess's instruction to stop, (*see id.*), and because Hess's use of force was not directed at Plaintiff, (*see id.* at 16).

With respect to the first argument, Defendants cite cases holding that "[a] police officer's order to stop constitutes a seizure if a reasonable person would have believed that he was not free to leave, and the person complies with the officer's order to stop."  *United States v. Simmons*, 560 F.3d 98, 105–06 (2d Cir. 2009) (citation and internal quotation marks omitted); *see also California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("[The Fourth Amendment] does not remotely apply . . . to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee.  That is no seizure."); *United States v. Swindle*, 407 F.3d 562, 572 (2d Cir. 2005) ("[A]n order to stop must be obeyed or enforced physically to constitute a seizure.").  According to Defendants, "[i]t is undisputed [D.J.] did not comply with Officer Hess'[s] instruction to stop."  (*See* Def.'s Mem. 13.)  But Defendants are misguided in this contention in a number of ways.

Plaintiff has not argued that Hess violated his Fourth Amendment rights when he allegedly raised his hand in an attempt to stop the vehicle; indeed, Plaintiff *disputes* that Hess ever yelled "Stop!" or made a gesture to indicate the vehicle should stop, (*see* Pl.'s 56.1 Resp. ¶ 70), and as that objection is supported by at least some record evidence, (*see, e.g.*, Cox Dep. 234–35; Hinds Dep. 205–06), that testimony must be credited at this stage. In any event, however, Plaintiff has alleged that the vehicle decelerated as it approached Hess, (*see* Pl.'s 56.1 ¶¶ 16–17), an account backed up by Witte's expert opinion that the vehicle slowed from 17 mph to 10 mph as it rounded the curve, (*see* Greenberger Decl. Ex. 7, at 80–81), and ended up striking Hess going no faster than 5 mph, (*see* Witte Revised Report 16–20). A seizure occurs when the target "submit[s] to police authority," *United States v. Baldwin*, 496 F.3d 215, 218 (2d Cir. 2007), and a "traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver," *Brendlin v. California*, 551 U.S. 249, 257 (2007). While the vehicle did not come to a stop until several moments later, when it careened into the side of a police vehicle, that was, from Plaintiff's point of view, only because Hess fired at the vehicle and prevented it from coming to a lawful stop. Indeed, Witte opined that D.J. could not have brought the vehicle to a complete stop before striking Hess, (*see* Witte Revised Report 20–22), thus allowing a jury to conclude that D.J. made every effort to fully submit to the authority of Hess's presence in the roadway.

But the more difficult question is whether Plaintiff was also seized when Hess struck him with a bullet, notwithstanding Hess's testimony that he was aiming only at the silhouette of the driver of the vehicle. As noted above, it is well settled that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Garner*, 471 U.S. at 7. The issue becomes more complicated, however, if the victim is not the intended

target of the deadly force.  In *Medeiros v. O'Connell*, 150 F.3d 164 (2d Cir. 1998), the Second

Circuit considered whether a hostage was seized within the meaning of the Fourth Amendment

when a bullet meant for the hostage's captor, who had commandeered a van and taken the three

passengers hostage, deflected off a metal support bar and struck one of the hostages.  *Id.* at 166–

67.  The Second Circuit concluded that the victim had not been seized, citing the Supreme

Court's holding in *Brower v. County of Inyo*, 489 U.S. 593 (1989), that although "[a] violation of

the Fourth Amendment requires an intentional acquisition of physical control," "[a] seizure

occurs even when an unintended person or thing is the object of the detention or taking, but the

detention or taking itself must be willful."  *Medeiros*, 150 F.3d at 167 (internal quotation marks

omitted).  Although the victim argued that "*Brower*'s references to intention and willfulness bear

upon the deliberateness of the means employed," the Second Circuit rejected that argument,

noting that other Courts of Appeals have "had little trouble with the issue," concluding that "the

accidental shooting of a hostage or innocent bystander" does not give rise to a Fourth

Amendment claim.  *Id.* at 168.  Accordingly, because the claim in the case "vindicate[d] no

interest protected by the Fourth Amendment," as "[s]o far from seeking to restrain [the victim's]

freedom, the troopers' every effort was bent on delivering all the hostages from deadly peril,"

*id.*, there was no Fourth Amendment violation.

        In *Brendlin*, decided several years after *Medeiros*, the Supreme Court held that,

consistent with its prior precedent, a stop of a vehicle by a show of authority effects a seizure of

all of the occupants in the vehicle, not just the driver.  *Id.* at 256–59.  The Supreme Court relied

on the test announced in *United States v. Mendenhall*, 446 U.S. 544 (1980), wherein Justice

Stewart opined that "a seizure occurs if in view of all of the circumstances surrounding the

incident, a reasonable person would have believed that he was not free to leave."  *Brendlin*, 551

U.S. at 255 (internal quotation marks omitted).  Using this test, the Supreme Court reasoned that in the circumstances of a typical traffic stop, "any reasonable passenger would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission," because "[a] traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver."  *Id.* at 257.  The Supreme Court additionally noted that its holding comported with the views of all nine Federal Courts of Appeals to have addressed the question, although the string cite following this assertion omits any reference to the Second Circuit.  *Id.* at 258.

The facts in this case are an imperfect fit with either of the cases cited above.  Plaintiff argues that *Brendlin* forecloses any inquiry into the subjective intent of Hess when he fired into the vehicle, (*see* Pl.'s Mem. of Law in Opp'n to Defs.' Mots. for Summ. J. ("Pl.'s Opp'n") 10–11 (Dkt. No. 122)), but this assertion overstates the holding in *Brendlin*.  The Supreme Court in *Brendlin* addressed only the question of whether the seizure of a vehicle—the show of authority intended to induce the driver of the vehicle to pull over—amounts to a seizure of a passenger.  As set forth above, there is no question in this case that when Hess stepped in front of the vehicle and induced D.J. to decelerate the vehicle in an effort to stop (and thereby submit to the authority of Hess), a seizure was effected as to all passengers in the car.  But that proposition does not go far enough to establish that the intentional use of force directed at a specific individual within the vehicle, i.e., the driver, gives rise to a Fourth Amendment claim on behalf of all of the passengers.

To be sure, as Plaintiff points out, *Medeiros* is an imperfect fit as well.  In *Medeiros*, there was no question that the purpose of the police officer's shots was to *rescue* the hostage from the kidnapper.  *See* 150 F.3d at 167.  Here, however, the purpose was not rescue—Hess

denies even knowing that Plaintiff was in the passenger seat, (*see* Hess Dep. 166)—but rather to disable the driver and bring the vehicle to a stop, (*see id.* at 440, 521). But while the Second Circuit in *Medeiros* acknowledged the unique circumstances of a kidnapper-hostage situation, the court's holding was grounded in the notion that "[t]he Fourth Amendment addresses misuse of power, not the accidental effects of otherwise lawful government conduct," 150 F.3d at 168 (alteration and internal quotation marks omitted), and "unintended consequence[s] of government action . . . cannot form the basis for a [F]ourth [A]mendment violation," *id.* at 169 (internal quotation marks omitted). Indeed, the Second Circuit made clear the central holding of the case: "We hold that no Fourth Amendment seizure occurred in the present case, because the police did not intend to restrain [the victim]." *Id.* Thus, nothing in the Second Circuit's opinion limited its holding to rescue attempts.

Courts in the Second Circuit have not interpreted *Medeiros* as narrowly as Plaintiff does. *See, e.g.*, *Malay v. City of Syracuse*, No. 08-CV-599, 2011 WL 4595201, at *9 (N.D.N.Y. Sept. 30, 2011) (dismissing the plaintiff's Fourth Amendment claim where the plaintiff was the unintentional victim of a gas attack because the "[p]laintiff was not injured by force that was deliberately applied to her"); *Pickering v. Mercado*, No. 03-CV-5654, 2006 WL 1026677, at *7 (E.D.N.Y. Apr. 17, 2006) (holding that where the passenger of a vehicle was shot when the driver refused to show his hands, the passenger had no Fourth Amendment claim because "there [was] simply no evidence in the record establishing that [the plaintiff] was the intended object of the force exerted by [the defendant]"); *Hickey v. City of New York*, No. 01-CV-6506, 2004 WL 2724079, at *14 (S.D.N.Y. Nov. 29, 2004) ("Therefore, in order for [the plaintiff] to have a Fourth Amendment claim, she must show as a threshold matter that she was the intended object of the force exerted by [the officer]."), *aff'd*, 173 F. App'x 893 (2d Cir. 2006). Plaintiff contends

that these cases are inapposite because they do not involve a moving vehicle. (*See* Pl.'s Opp'n 11 n.3.) But this argument does nothing to rebut the fact that courts in the Second Circuit have not limited *Medeiros* to its facts, and while perhaps some additional issues could arise in situations where a vehicle is in motion, at least one court has applied *Medeiros* to facts similar to those here without finding or even addressing any potential conflict with *Brendlin*. *See Longwa v. Larregui*, No. 07-CV-733, 2011 WL 4005406, at *4 (D. Conn. Sept. 9, 2011) (holding that where an officer fired at a driver in a vehicle moving toward him and accidentally struck the passenger, the passenger did not have a Fourth Amendment claim because "the [o]fficers did not intend to shoot [the passenger], and thus did not seize him within the meaning of the Fourth Amendment"). Thus, while *Medeiros* was decided before *Brendlin*, there is no authority supporting Plaintiff's contention that the two are in conflict.

Admittedly, however, there is some tension between *Medeiros* and *Brendlin* in that the officers firing into vehicles in *Medeiros* and its progeny did so for the purpose of stopping the vehicle, the same purpose pursued by the officer in *Brendlin*. But while future Second Circuit and Supreme Court cases may later elaborate on the interaction between these two cases, this Court is constrained to follow the law as it exists, and unless and until the Second Circuit clarifies or overrules *Medeiros* in contexts such as this one, the Court is bound to accept its holding. Accordingly, under *Medeiros*, a victim of a shooting is not seized if the victim was not the intended target of the force.

Notwithstanding this legal hurdle, Plaintiff contends, in a footnote, that circumstantial evidence "casts doubt on Hess's claim not to have seen [Plaintiff] when he shot," and that "[a] jury would likely conclude [Hess] also saw [Plaintiff's] 'silhouette' next to D.J.'s and knew that firing his gun would stop both driver and passenger." (Pl.'s Opp'n 10 n.2.) The Court

acknowledges that, as Plaintiff notes, "[c]ircumstantial evidence may permit a factfinder to infer that a witness had knowledge of a particular fact despite his testimonial denial of knowledge," *In re Dana Corp.*, 574 F.3d 129, 153 (2d Cir. 2009), but even assuming there is sufficient evidence from which a jury could infer that Hess *saw* Plaintiff, there is no evidence that Hess actually directed his shots at Plaintiff. Plaintiff notes that "[t]he bullet pattern is consistent with shooting at both the driver and the front seat passenger," (Pl.'s Mem. 10 n.2), but this fact does nothing to advance the case—all Parties agree that Plaintiff was shot, so pointing to the fact that one bullet traveled on a trajectory leading to Plaintiff adds nothing. Nor does the fact that Plaintiff was in the vehicle with D.J., the individual at whom Hess admits he was aiming, prove that he was also the target of force. A court has rejected similar arguments in a similar circumstance, calling them nothing but "loose allegations." *Hickey*, 2004 WL 2724079, at *14 (dismissing Fourth Amendment claim because the "plaintiffs [had] produced no actual evidence indicating that [the officer] was attempting to restrain [the victim] when he fired," and the victim's "proximity to [the intended target] on the porch does not in of itself give rise to the inference that the officers intended to restrain her"). And not only is Plaintiff's contention unsupported by the evidence, it is simply illogical—Hess testified without contradiction that it was his intent to stop the vehicle, an objective that shooting a passenger in the vehicle would not have served to effect. Finally, Plaintiff's decision to relegate this argument to a footnote is suggestive of its weakness and an inappropriate means of raising substantive arguments. *See In re MF Global Holdings Ltd. Inv. Litig.*, No. 11-CV-7866, 2014 WL 8184606, at *2 (S.D.N.Y. Mar. 11, 2014) ("It is generally inappropriate to make substantive arguments in footnotes."), *aff'd*, 611 F. App'x 34 (2d Cir. 2015); *In re Crude Oil Commodity Litig.*, No. 06-CV-6677, 2007 WL 2589482, at *3 (S.D.N.Y.

Sept. 8, 2007) ("Arguments which appear in footnotes are generally deemed to have been waived.").

Thus, although Hess effected a seizure of Plaintiff (and the other occupants of the vehicle) when he stepped in front of the vehicle and compelled D.J. to slow the car down in an attempt to submit to Hess's authority, Hess did not effect a seizure of Plaintiff when he fired into the vehicle, aiming at D.J. and accidentally striking Plaintiff. Plaintiff may very well have some recourse against Hess arising out the shots he fired into the vehicle, but it is not by way of the Fourth Amendment. *See Hickey*, 2004 WL 2724079, at *15 ("Police misconduct outside of the context of Fourth Amendment seizures may still give rise to claims under the substantive due process protections of the Fourteenth Amendment.").

### c. Reasonableness of Suspicion

The Court must next assess whether Hess's seizure of the vehicle was supported by "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette*, 134 S. Ct. at 1687 (internal quotation marks omitted). "The reasonable suspicion necessary to justify such a stop is dependent upon both the content of information possessed by police and its degree of reliability." *Id.* (internal quotation marks omitted). "[R]easonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop." *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009).

Defendants contend that there were several factors that gave rise to reasonable suspicion in this case: (1) Hess saw and heard the car accelerate from a stopped position in a fire lane, where stopping is prohibited under Town of Mount Pleasant Code § 206-16; (2) he saw the vehicle knock Officer Gagnon off balance; (3) he heard Officer Gagnon yell, "Stop!" or "Stop

that car!"; and (4) he saw the vehicle accelerate to an unsafe speed. (*See* Def.'s Mem. 15.) As Plaintiff rightly points out, (*see* Pl.'s Opp'n 12–13), all of these facts are disputed. First, Hess admitted that he never saw the vehicle when it was stopped in the fire lane, only saw the vehicle after it had started moving, and could not even tell whether the vehicle was still in the fire lane when he saw it. (*See* Hess Dep. 146–47.) Second, Plaintiff disputes that the vehicle knocked Officer Gagnon off balance, (*see* Pl.'s 56.1 Resp. ¶ 60), and there is evidence to support this assertion, (*see* Van Ostrand Dep. 261 (testifying that he did not witness the vehicle come into contact with anyone except Hess); Gilmartin Dep. 149–50 (testifying that he did not witness the vehicle hit anyone except Hess)). Third, Plaintiff disputes that Officer Gagnon yelled for the vehicle to stop, (*see* Pl.'s 56.1 Resp. ¶ 61), and, again, there is some evidence to support this, (*see* Beckley Dep. 19 (testifying that he did not hear an airhorn or anybody yelling)).

Finally, the Court rejects Defendants' argument that a reasonable officer seeing a vehicle traveling at 17 mph in a parking lot would suspect illegal activity. There was no speed limit posted in the parking lot, (*see* Hinds Dep. 232; Greenberger Decl. Ex. 22), and Mt. Pleasant's traffic code does not generally set speed limits for parking lots where none is posted, (*see* Pl.'s 56.1 Resp. ¶ 65 (citing Mt. Pleasant Code §§ 145-2, 145-3, 145-9, 145-14, 145-15, 145-16, 145-21, http://ecode360.com/9606637#9606672).) Moreover, the vehicle's speed peaked at 17 mph prior to its collision with Hess, but it was not traveling at that speed for all or even most of the time before impact. (*See* Witte Revised Report 12–13.) And while Hess opined that the vehicle was "speeding imprudently in an area with lots of people," (Hess Dep. 732), other testimony contradicts or calls into question the accuracy of that statement, (*see* Cox Dep. 274–75 (the vehicle traveled at "regular parking lot speed"); Hinds Dep. 198 (the vehicle travelled "slowly")). And Hess himself admitted that he did not recall any pedestrians being in the

roadway during the incident.  (*See* Hess Dep. 157–60.)  Under these circumstances, it cannot be said that the vehicle's mere acceleration to 17 mph was so dramatic or unsafe as to create a reasonable suspicion of illegal behavior.  *Cf. Whren v. United States*, 517 U.S. 806, 808, 819 (1996) (finding reasonable suspicion where the vehicle was in a "high drug area" of the city in an unmarked car with temporary license plates, remained stopped at a stop sign for an unusually long period of time, made an abrupt right turn without signaling, and sped off at an "unreasonable" speed) (internal quotation marks omitted); *Cooper v. City of Hartford*, No. 07-CV-823, 2009 WL 2163127, at *8 (D. Conn. July 21, 2009) (holding that although "the vehicle was traveling at a high rate of speed," the "totality of the circumstances, viewed in the light most favorable to the plaintiff, did not provide the officers with a particularized and objective basis for suspecting that the occupants of [the] vehicle were engaged in criminal activity"); *United States v. Culmer*, 736 F. Supp. 474, 477–78 (S.D.N.Y. 1990) (finding reasonable suspicion where the officer observed the occupants of the vehicle peering at him through the rear window, the vehicle travelled at an "excessive rate of speed" and made an illegal right turn, and several other circumstances indicated criminal activity).

Defendants cite, for the first time in their reply brief, (*see* Reply Mem. of Law in Supp. of Def. Aaron Hess' Mot. for Summ. J. ("Def.'s Reply") 9 (Dkt. No. 128)), to New York Vehicle and Traffic Law § 1180(a), which provides that "[n]o person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing."  But while it is undisputed that D.J.'s vehicle was traveling, for at least a moment in time, at 17 mph, New York courts have generally held that whether a vehicle is moving at "a speed greater than is reasonable and prudent under the conditions" is a question of fact.  *See St. Andrew v. O'Brien*, 845 N.Y.S.2d 184, 188 (App. Div. 2007)

("[W]hether the driver's speed was reasonable under the particular circumstances in which she knowingly proceeded is a question for the trier of fact to resolve." (citation omitted)); *Smart v. Wozniak*, 397 N.Y.S.2d 489, 491 (App. Div. 1977) ("Whether [the plaintiff's] speed was reasonable under the conditions was a question of fact for the jury." (citation omitted)). To be sure, Defendants need not prove that D.J. *actually* violated § 1180(a), only that Hess had reasonable suspicion that he had. But in these circumstances, where the evidence shows only that the vehicle was traveling at a maximum speed of 17 mph (for only a moment) through a driving lane in which no pedestrians were standing, the Court cannot conclude as a matter of law that Hess reasonably suspected the vehicle was traveling at a speed imprudent under the circumstances.

Because Defendants' arguments for reasonable suspicion all rest on disputed facts, the Court cannot, at this stage, hold that Plaintiff's Fourth Amendment claim arising out of the seizure of the vehicle fails as a matter of law. Accordingly, while Plaintiff's Fourth Amendment claim arising out of Hess's shooting into the vehicle is dismissed, Plaintiff has established grounds for a Fourth Amendment claim arising out of Hess's seizure of the vehicle by way of stepping into the roadway and causing D.J. to submit to this authority.

## 2. Substantive Due Process

Notwithstanding that the shooting of the vehicle does not give rise to a Fourth Amendment claim, Plaintiff may still proceed with that claim under the theory that Hess violated Plaintiff's substantive due process rights. Whenever "a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing th[o]se claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal

quotation marks omitted). However, a substantive due process analysis is appropriate where the claim is not covered by the Fourth Amendment. *See County of Sacramento*, 523 U.S. at 843.

The "touchstone of due process is protection of the individual against arbitrary action of government." *Id.* at 845 (alteration and internal quotation marks omitted). "Alleged abuses of the police power are sufficiently arbitrary to rise to constitutional magnitude only when the conduct at issue 'shocks the conscience.'" *Medeiros*, 150 F.3d at 170. Although "the measure of what is conscience shocking is no calibrated yard stick," *County of Sacramento*, 523 U.S. at 847, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level," *id.* at 849. Where a claim for excessive force is raised under the Fourteenth Amendment, the Court should consider "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hemphill v. Schott*, 141 F.3d 412, 419 (2d Cir. 1998) (internal quotation marks omitted).[3]

Defendants first argue that Plaintiff cannot raise a substantive due process claim because it was not properly pleaded in the Complaint. (*See* Def.'s Mem. 21.) The First Cause of Action in the Complaint raises a claim under 42 U.S.C. § 1983 arising out of violations of Plaintiff's "rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution." (Compl. ¶ 72.) The Complaint does not, however, specifically use the term "due process."

---

[3] The Second Circuit acknowledged in *Hemphill* that these factors, drawn from Judge Friendly's opinion in *Johnson v. Glick*, 481 F.2d 1028 (2d Cir. 1973), were designed to measure excessive force in the context of an Eighth Amendment claim. *See Hemphill*, 141 F.3d at 419. Still, the Second Circuit determined that those factors are appropriate for consideration where a due process claim is raised, and the Court sees no reason to depart from that instruction here.

Nevertheless, Plaintiff is correct that the Complaint is sufficient to raise a substantive due process claim. The First Cause of Action unambiguously invokes Plaintiff's rights under the Fourteenth Amendment and references Hess's use of "excessive force," which forms the basis for Plaintiff's due process claim. (*Id.*) "[A] complaint need not correctly plead every legal theory supporting the claim," although the plaintiff must at least "set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense." *Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000). Plaintiff's invocation of the Fourteenth Amendment accompanied by the factual allegations giving rise to a substantive due process claim plainly satisfies this standard. *See Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 712 n.4 (2d Cir. 1980) ("Generally a complaint that gives full notice of the circumstances giving rise to the plaintiff's claim for relief need not also correctly plead the legal theory or theories and statutory basis supporting the claim.").

Moreover, there is no prejudice to Defendants for considering the claim. Importantly, Plaintiff did not raise the substantive due process claim in his opposition papers in an attempt to salvage an otherwise doomed claim for excessive force, which would have been inappropriate. *See Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 170 F.R.D. 111, 119 (S.D.N.Y. 1997) ("[I]t is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment."). Instead, Hess's premotion letter references the substantive due process claim and explains its purported deficiencies (although the letter does not suggest that the claim was inadequately pled)—Hess therefore appears to have been put on notice before the briefing on this Motion as to the existence of the due process claim. (*See* Letter from Brian S. Sokoloff, Esq., to Court (Oct. 11, 2016) (Dkt. No. 101).) And the factual basis for the due process claim is

the same as the Fourth Amendment claim; there is thus no undue surprise to Defendants that would warrant disregarding the claim at this stage.

The cases cited by Defendants on this point are inapposite. In each of them, the issue was not the formal structure of the pleadings, but rather the absence of any allegations of a violation of due process. *See Vessa v. City of White Plains*, No. 12-CV-6989, 2014 WL 1271230, at *2 n.7 (S.D.N.Y. Mar. 27, 2014) (noting that a "mere passing reference to the Fourteenth Amendment" was insufficient to state a due process claim "absent *any* allegations that [the] [d]efendants did, in fact, violate [the] [p]laintiff's Due Process rights"), *aff'd*, 588 F. App'x 9 (2d Cir. 2014); *Koltun v. Berry*, No. 13-CV-1612, 2013 WL 11933966, at *9 (S.D.N.Y. Oct. 25, 2013) (recommending dismissal of due process claims because "the complaint's references to due process under the Fourteenth Amendment [were] entirely opaque and [did] not appear to allege anything beyond the claims previously addressed") (report and recommendation); *DeFilippo v. N.Y. State Unified Ct. Sys.*, No. 00-CV-2109, 2006 WL 842400, at *20 (E.D.N.Y. Mar. 27, 2006) ("While the court notes that the [p]laintiff did mention the [Fourteenth] Amendment in his complaint and did reference 'the due process of law[,]' it is plain that the [a]mended [c]omplaint does not allege a due process violation in connection with the [p]laintiff's disciplinary hearing.") (citation omitted), *aff'd* 223 F. App'x 45 (2d Cir. 2007); *Balaber-Strauss v. Town/Village of Harrison*, 405 F. Supp. 2d 427, 434 (S.D.N.Y. 2005) (dismissing due process claims because "[t]he [c]omplaint contain[ed] no allegations supporting th[o]se alleged constitutional violations"). None of these cases addresses the situation where, as here, a plaintiff pleads the factual basis for a substantive due process claim and unambiguously invokes the Fourteenth Amendment in the context of a claim of excessive force in the first cause

of action.  The Court is satisfied that Plaintiff adequately pleaded a substantive due process claim and that consideration of the claim works no prejudice against Defendants.

With respect to the merits of the substantive due process claim, "the record contains sufficient facts from which a fact finder could infer that [Plaintiff] meets the requirements under the Due Process clause that [Hess's] conduct shocks the conscience." *Hemphill*, 141 F.3d at 419 (internal quotation marks omitted).  Regarding "the need for the application of force[] [and] the relationship between the need and the amount of force that was used," *id.* (internal quotation marks omitted), the facts construed in favor of Plaintiff indicate that Hess had no need to use any force, much less deadly force.  Under Plaintiff's version of the facts, Hess did not hear a revving engine, did not hear another officer yell "Stop!," did not see a fellow officer knocked off balance, and thus had no basis to believe that the vehicle posed a threat to anyone.  Nonetheless, Hess ran out into the roadway with his weapon drawn and began firing almost immediately.  By Witte's estimate, no more than 1.3 seconds passed between when Hess stepped into the roadway and when the vehicle struck him, (*see* Witte Revised Report 20), and thus any danger posed by the vehicle's trajectory was entirely of Hess's own creation.  He stepped in front of the vehicle at such a distance that it would have been impossible for D.J. to react quickly enough to stop the vehicle, despite his best efforts, (*see id.* at 22), and acted without any apparent legitimate motive or purpose.  That Hess eventually found himself on the hood of the vehicle as its driver, apparently wounded by multiple bullets, pressed the accelerator is of little help to Defendants, as the situation was itself the result of Hess's unjustified use of deadly force and aggressive intervention.  Taken as true, these facts indicate the absence of any need for application of force, and these two factors thus cut in favor of Plaintiff.  *See Ali v. Szabo*, 81 F. Supp. 2d 447, 457 (S.D.N.Y. 2000) (denying summary judgment because "the [c]ourt must construe the facts in

favor of the non-movant," and therefore "the [c]ourt assume[d] for purposes of th[e] motion that [the plaintiff] was obeying the order to return to his cell when the incident occurred").

With regard to the "extent of injury inflicted," *Hemphill*, 141 F.3d at 419 (internal quotation marks omitted), while the record does not indicate the extent of Plaintiff's injury, it does reveal that he was shot in the arm. (*See* Pl.'s 56.1 ¶ 43; Def.'s 56.1 Resp. ¶ 43.) Whatever the standard for injury in the context of the Fourteenth Amendment, a bullet wound surely suffices. *See, e.g.*, *Ali*, 81 F. Supp. 2d at 458 (holding that a plaintiff's complaint "of pain and numbness in his hands and back for weeks after the incident; . . . swelling of his hand and a strained back two months after the incident; and . . . pain . . . at the time of his deposition" sufficed for excessive force purposes).[4]

Finally, the Court must consider whether there is evidence that Hess acted "maliciously and sadistically for the very purpose of causing harm." *Hemphill*, 141 F.3d at 419 (internal quotation marks omitted). Plaintiff argues that a jury could infer that Hess was determined to stop the vehicle at any cost because he believed its occupants had disrespected the authority of Officer Gagnon by ignoring Officer Gagnon's order to stop. (*See* Pl.'s Opp'n 23.) But this argument is in conflict with Plaintiff's assertion in his brief and 56.1 response statement, accepted by the Court for purposes of these Motions, that Officer Gagnon never gave such a direction, or perhaps gave it only after Hess had already entered the street. (*See* Pl.'s 56.1 Resp. ¶ 63; Pl.'s Opp'n 13.)

---

[4] Defendants' description of Plaintiff's bullet wound as a "flesh wound" is not only unsupported by any record evidence, it defies common sense. Moreover, the Court is aware of no authority holding that only injuries that require "surgery" or "extensive care," (*see* Def.'s Reply 19), are actionable for Fourteenth Amendment purposes.

Nevertheless, a jury could conclude that the strikingly arbitrary and inexplicable sequence of events—a police officer dashing in front of a moving vehicle with his gun raised for no apparent reason before firing at the vehicle and lunging onto the hood—shows the maliciousness or bad faith of Hess's actions. *See Blue v. Koren*, 72 F.3d 1075, 1084 (2d Cir. 1995) ("[P]articularized evidence of improper motive may include . . . the highly unusual nature of the actions taken."). It is for a jury to decide which version of the facts to believe, but at this stage, the Court must accept Plaintiff's version, and that sequence of events is harrowing enough to "shock[] the conscience." *Medeiros*, 150 F.3d at 170 (internal quotation marks omitted). Plaintiff has therefore established facts giving rise to a substantive due process claim under the Fourteenth Amendment.

### 3. Qualified Immunity

Notwithstanding the above, Hess may be entitled to qualified immunity on the claims arising out of the alleged constitutional violations.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "[Qualified] immunity protects government's ability to perform its traditional functions . . . by helping to avoid unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits." *Filarsky v. Delia*, 566 U.S. 377, 389–90 (2012) (alteration and internal quotation marks omitted). Qualified immunity shields a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate

clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted). Summary judgment may be granted on the "basis of a qualified immunity defense premised on an assertion of objective reasonableness [if] the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *O'Bert*, 331 F.3d at 37 (alteration and internal quotation marks omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable law enforcement officer in the defendant's position would have believed his or her conduct would violate the asserted constitutional right. *See Pearson*, 555 U.S. at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). The Supreme Court has further instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (second alteration in original) (citation and internal quotation marks omitted). Furthermore, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Id.* at 2094 (citations and internal quotation marks omitted). Otherwise stated, to determine whether a

right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).

### a.  Fourth Amendment Seizure

With respect to Hess's decision to stop the vehicle, Defendants argue that Hess is entitled to qualified immunity because he had arguable reasonable suspicion of illegal activity.  (*See* Def.'s Mem. 11.)  Although Plaintiff adduces arguments as to why Hess is not entitled to qualified immunity for his *shooting* at the vehicle, he makes no argument with respect to Hess's decision to *seize* the vehicle and its occupants by stepping into the roadway and making a show of authority.  (*See* Pl.'s Opp'n 18–21.)  Whatever the case law may say about the circumstances in which an officer may use deadly force, that does not answer the question of whether it was clearly established law that Hess was not allowed to attempt to stop the vehicle because he reasonably suspected illegal activity.  Moreover, courts typically do not hesitate to grant qualified immunity where the plaintiff did not oppose the application and the claim for qualified immunity is at least "facially meritorious."  *Cossey v. David*, No. 04-CV-1501, 2007 WL 3171819, at *9 (N.D.N.Y. Oct. 29, 2007); *see also Soller v. Boudreaux*, No. 12-CV-167, 2015 WL 500492, at *13 n.6 (E.D.N.Y. Feb. 3, 2015) (granting qualified immunity where the "[p]laintiffs did not respond in any way to the [c]ounty's contention that the officers are entitled to qualified immunity from their [§] 1983 claims against them").

While the Court cannot conclude at this stage that Hess had reasonable suspicion to stop D.J.'s vehicle merely because it was going 17 mph in a parking lot, *see supra*, Hess's uncontested claim for qualified immunity with respect to the stop is at least facially meritorious.

When analyzing an officer's claim for qualified immunity in the context of an investigatory stop, the Court must examine whether "(a) it was objectively reasonable for the officer[s] to believe reasonable suspicion existed or (b) officers of reasonable competence could disagree on whether the reasonable suspicion test was met." *Sutton v. Duguid*, No. 05-CV-1215, 2007 WL 1456222, at *6 (E.D.N.Y. May 16, 2007); *see also Ozga v. Elliot*, 150 F. Supp. 3d 178, 189 (D. Conn. 2015) ("[I]f the police conduct a limited investigative detention, they have qualified immunity so long as they had at least *arguable* reasonable suspicion to warrant the limited detention."); *Gil v. County of Suffolk*, 590 F. Supp. 2d 360, 370 (E.D.N.Y. 2008) (granting qualified immunity because there was "no genuine issue of material fact as to whether arguable reasonable suspicion existed for the initial stop and detention to support qualified immunity").

As discussed above, whether a vehicle is moving at a speed "greater than is reasonable and prudent under the conditions," N.Y. Veh. & Traf. Law § 1180(a), is ordinarily a question of fact. Given the totality of the circumstances, however, and accepting Plaintiff's version of the facts as true, reasonable officers could disagree as to whether reasonable suspicion existed to stop D.J.'s vehicle for a violation of New York Vehicle and Traffic Law § 1180(a). As detailed above, the Court accepts Plaintiff's version that no other officer yelled "Stop!" or was knocked off of balance by the vehicle. Nevertheless, all Parties agree there were a large number of individuals at the scene, and while none of them was standing directly in the path of the vehicle, a reasonable officer could conclude that given the number of pedestrians, a vehicle traveling at any speed above 5 or 10 mph posed a danger and was not operating in a way that was reasonable or prudent. When evaluating a claim for qualified immunity, a court must keep in mind that "police officers are often forced to make split-second judgments[ ]in circumstances that are tense, uncertain and rapidly evolving." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999)

(internal quotation marks omitted).  As there is no clearly-established law holding that a stop under these or similar circumstances is impermissible, the Court agrees that Hess is entitled to qualified immunity with respect to his Fourth Amendment seizure of the vehicle.

### b.  Substantive Due Process

Regarding Hess's claim for qualified immunity arising out of his shooting into the vehicle, which, as discussed above, gives rise to a claim under the Fourteenth Amendment, the Court is not persuaded that Hess is entitled to qualified immunity under the facts set forth by Plaintiff.  Taking Plaintiff's version of the events as true, Hess ran into the roadway unprovoked (except perhaps under the belief that a minor traffic violation had occurred) and almost immediately began firing at the vehicle.  Hess left no time for the vehicle to come to a complete stop and gave D.J. no opportunity to avoid striking Hess.  Courts have consistently held that an unprovoked assault on a citizen is clearly constitutionally impermissible under existing law.  *See, e.g.*, *Jackson v. Tellado*, 236 F. Supp. 3d 636, 663 (E.D.N.Y. 2017) ("It is clearly established that an officer punching someone in the face unprovoked violates that person's rights."); *Johnson v. Hable*, No. 05-CV-451, 2008 WL 4425544, at *4–5 (W.D.N.Y. Sept. 30, 2008) (denying qualified immunity at summary judgment where the plaintiff alleged that "in an unprovoked attack, a number of officers assaulted him and cut his forehead with a knife while he was handcuffed"); *Smith v. Donahue*, No. 03-CV-325, 2005 WL 1460173, at *6 (W.D.N.Y. June 21, 2005) (denying qualified immunity at summary judgment where the plaintiff contended "that he was the victim of an unprovoked attack and was stomped upon and kicked"); *cf. Posr v. Doherty*, 944 F.2d 91, 95–96 (2d Cir. 1991) (affirming jury verdict against officers because "[t]he right of an individual not to be subjected to excessive force is well established," and the jury "plainly rejected" the version of the events offered by the officers).

Defendants point to the Supreme Court's recent holding in *White v. Pauly*, 137 S. Ct. 548 (2017), in support of Hess's claim for qualified immunity. (*See* Def.'s Mem. 7–8.) There, the Supreme Court held that a defendant officer who shot a suspect after the suspect's brother had fired two shotgun blasts at the officers and the suspect himself had pointed a handgun in the direction of the defendant was entitled to qualified immunity. *See White*, 137 S. Ct. at 550, 552–53. The Tenth Circuit had held that the defendant was not entitled to qualified immunity because a reasonable officer would have known that "he could not have used deadly force without first warning [the suspect] to drop his weapon." *Id.* at 551. In reversing, the Supreme Court reminded the lower courts that "clearly established law should not be defined at a high level of generality," and admonished the Tenth Circuit for failing "to identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment." *Id.* at 552 (internal quotation marks omitted). In particular, the Supreme Court noted that the Tenth Circuit had acknowledged that the case "present[ed] a unique set of facts and circumstances," and that this observation alone "should have been an important indication to the majority that [the defendant's] conduct did not violate a clearly established right." *Id.* (internal quotation marks omitted).

Defendants contend that *White* counsels in favor of qualified immunity here because the circumstances are sufficiently unique to hold Hess accountable for his constitutional violations. While the Court agrees that Hess's version of the events presents a unique set of circumstances that would give rise to serious questions about the applicability of qualified immunity, at summary judgment, the facts presented by Plaintiff show only that Hess ran into the path of an oncoming vehicle and began firing immediately into the windshield. For that reason, the cases cited by Defendants are distinguishable, as they involve factual circumstances different from the

events described by Plaintiff.  *See, e.g.*, *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (granting

qualified immunity where the defendant officer "confronted a reportedly intoxicated fugitive, set

on avoiding capture through high-speed vehicular flight, who twice during his flight had

threatened to shoot police officers, and who was moments away from encountering an officer at

[another street]"); *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2021 (2012) (finding no Fourth

Amendment violation where "the chase in [the] case exceeded 100 miles per hour and lasted

over five minutes," during which the driver "passed more than two dozen other vehicles, several

of which were forced to alter course"); *Brousseau v. Haugen*, 543 U.S. 194, 200 (2004) (granting

qualified immunity where the defendant officer was faced with the decision "whether to shoot a

disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate

area are at risk from that flight").  These cases, all of which involved high-speed chases in which

civilians were put at risk by reckless driving, do not match at all the circumstances put forth by

Plaintiff here, where the vehicle moved no faster than 17 mph, slowed down in an attempt to

avoid colliding with Hess, and accelerated only after shots had already been fired at the

windshield.  As set forth above, the constitutional prohibition on unprovoked use of deadly

force—an issue far afield from the facts in *White*—is well settled, and no reasonable officer

would conclude that Hess was constitutionally permitted to enter the roadway in front of a

moving vehicle moving at 17 mph with no pedestrians in the road and begin firing almost

immediately.

If nothing else, the numerous factual disputes in this case warrant a denial of qualified

immunity at this stage.  *See, e.g.*, *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) ("The

parties' versions of the material facts differ markedly on the[] issue[] [of excessive force].  These

differences also preclude summary judgment on the defense of qualified immunity."); *Thomas*,

165 F.3d at 143 ("[T]he district court should not have granted summary judgment to the defendants on qualified immunity grounds unless it concluded that the only result a fair jury could reach is that reasonable police officers could disagree about whether the force used . . . was excessive.  The district court could not properly reach this conclusion if any material facts were in dispute.").  The Second Circuit's decision in *Thomas* is instructive because there, in the context of a Fourth Amendment claim for excessive force, the court reversed a grant of qualified immunity because the parties "disputed material facts that implicate[d] the reasonableness of the officers' use of force."  165 F.3d at 144.  Although a different constitutional amendment applies here, the same situation exists—whether Hess acted maliciously and sadistically by using excessive force in violation of Plaintiff's Fourteenth Amendment rights depends on disputed facts, and qualified immunity is therefore inappropriate at this stage.

The facts at trial may undermine Plaintiff's version of the events, and Hess is therefore entitled to raise his defense of qualified immunity at trial.  But at this stage, the Court cannot conclude on the record before it that Hess is entitled to qualified immunity with respect to Plaintiff's Fourteenth Amendment substantive due process claim arising out of Hess's shooting of the vehicle.  Accordingly, Defendants' Motions are denied in this respect.

### 4.  State Law Assault and Battery

Plaintiff has also brought a claim for assault and battery under state law against Hess. Both Parties agree that "[f]ederal excessive force claims and state law assault and battery claims against police officers are nearly identical."  *Graham v. City of New York*, 928 F. Supp. 2d 610, 624 (E.D.N.Y. 2013); *see also Posr*, 944 F.2d at 94–95 (noting that § 1983 use of excessive force and state law assault and battery claims are properly analyzed together because "the essential elements of the two claims . . . [are] substantially identical").  Under state law, in

addition to proving that an officer "made bodily contact, that the contact was offensive, and that the officer intended to make the contact," a plaintiff must show also that the battery does not fall within the protection of New York Penal Law § 35.30, which "provides that a police officer may employ deadly force when the use of deadly physical force is necessary to defend the police officer or another person from what the officer reasonably believes to be the use or imminent use of deadly physical force." *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 563 (S.D.N.Y. 2010) (alteration, citations, and internal quotation marks omitted). Thus, as in a federal excessive force claim, the Court must examine whether "the officer's use of force was excessive or objectively unreasonable under the circumstances." *Pelayo v. Port Auth.*, 893 F. Supp. 2d 632, 642 (S.D.N.Y. 2012) (internal quotation marks omitted).

There is no dispute here that Hess made bodily contact with Plaintiff and that the contact was offensive. With respect to whether Hess intended to make such contact, Plaintiff correctly points out that the fact that Hess testified that he aimed his bullets at D.J. (and not Plaintiff) is not an obstacle in this context because in New York, "the fact that the [defendant] made physical contact with [the plaintiff] and not the intended target does not negate the conclusion that the act was done with the intention to commit an assault or a battery." *Parler v. N. Sea Ins. Co.*, 11 N.Y.S.3d 659, 661 (App. Div. 2015); *see also Jones v. State*, 468 N.Y.S.2d 223, 227 (App. Div. 1983) ("The rule is that in an action for intentional tort, the wrongdoer will be held responsible for the injuries which he has directly caused even though they lie beyond the limit of natural and apprehended results as established in cases where the injury was unintentional.") (internal quotation marks omitted). Defendants do not contest this basic point. Accordingly, the fact that Hess aimed only at D.J. does not affect Plaintiff's state law claim for assault and battery.

Defendants do argue, however, that Hess (and, by extension, the Village of Pleasantville) cannot be held liable for assault and battery because Hess "acted in self-defense and to protect the pedestrians in the parking lot." (Def.'s Mem. 24.) Again, however, Defendants draw this conclusion based on their interpretation of facts, which is impermissible at this stage. In support of their argument, Defendants cite a line of cases examining federal claims for excessive force holding that an officer's "actions leading up to the shooting are irrelevant to the objective reasonableness of his conduct at the moment he decided to employ deadly force," because "[t]he reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996); *see also Fortunati v. Campagne*, 681 F. Supp. 2d 528, 536 (D. Vt. 2009) ("District courts in the Second Circuit are precluded from taking a broader view and considering, for example, whether the police created the need for deadly force in the first place."), *aff'd sub nom. Fortunati v. Vermont*, 503 F. App'x 78 (2d Cir. 2012). From this, Defendants argue that whether Hess himself created a situation in which deadly force was required is irrelevant. But the cases cited do not stand for this broad proposition—indeed, the Second Circuit has instructed courts to look at the "circumstances *immediately prior to* and at the moment" force was used. *Salim*, 93 F.3d at 92 (emphasis added). By Witte's estimate, less than 1.3 seconds passed between when Hess stepped in front of the vehicle and when it collided with him, (*see* Witte Revised Report 20), and the time between when Hess stepped into the roadway and when he fired the first shot is even less, given that Plaintiff has testified that Hess fired the first shot before he collided with the hood, (*see* Cox Dep. 242–44; Cox 50-h Testimony 71–72). Whatever span of time the Second Circuit intended district courts to look at when evaluating the

circumstances "immediately prior to" a deadly shooting, that span certainly includes the 1.3 seconds immediately prior to the first shot in this case.

Moreover, the claim in *Salim* was that the officer had caused the deadly situation by "failing to carry a radio or call for back-up, and also for failing to disengage when . . . other children entered the fray." 93 F.3d at 92. The circumstances there were thus far different from those present here. Under Defendants' interpretation of the law, a police officer would be justified in standing on the side of a busy highway, stepping in front of speeding cars, and firing into the windshields under the guise of self-defense. Such a conclusion is both beyond the scope of *Salim* and unreasonable, and while those precise facts are not present here, the facts as alleged by Plaintiff offer no legitimate justification for Hess's decision to dash into the path of an oncoming vehicle with his gun drawn and immediately begin firing.

Defendants provide no other case law in support of their claim that Hess acted reasonably except a citation to *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015), wherein the Supreme Court held that the Fourth Amendment (and, apparently by extension, New York state law assault and battery) does not prevent officers from "protecting themselves." *Id.* at 1775. As that is plainly not the situation under Plaintiff's version of the facts, summary judgment on the state law assault and battery claim against Hess is inappropriate. Additionally, because Hess was undisputedly acting within the scope of his employment when he fired at the vehicle, the Village of Pleasantville may be held liable under a theory of respondeat superior. (*See* Mem. of Law in Supp. of the Village's Mot. for Summ. J. 3 (Dkt. No. 112).) Defendants' Motions are therefore denied with respect to the state law assault and battery claims.[5]

---

[5] Although New York has its own version of qualified immunity, *see Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006), Defendants have not moved for summary judgment on that basis,

### 5.  John Doe Defendants

No Party makes any reference to the remaining John Doe Defendants.  It is well settled that where a plaintiff has made no attempt to amend its complaint to include the real identities of John Doe Defendants and discovery has closed, the proper course is to dismiss the John Doe Defendants without prejudice.  *See Kaczmarek v. City of Schenectady*, No. 10-CV-1193, 2013 WL 5506276, at *2 (N.D.N.Y. Oct. 4, 2013) ("Because [the] plaintiffs have failed to timely identify and serve the John Doe defendants, [the] plaintiffs' claims against both John Doe defendants are dismissed."); *Sachs v. Cantwell*, No. 10-CV-1663, 2012 WL 3822220, at *10 (S.D.N.Y. Sept. 4, 2012) ("Where discovery has closed and the [p]laintiff has had ample time and opportunity to identify and serve John Doe [d]efendants, it is appropriate to dismiss those [d]efendants without prejudice." (internal quotation marks omitted)).  Accordingly, because Plaintiff has not amended his Complaint, any claims against the John Doe Defendants are dismissed without prejudice.

---

and thus the Court will not consider whether Hess may be entitled to qualified immunity under state law.

## III. Conclusion

For the foregoing reasons, Defendants' Motions are granted in part and denied in part. Plaintiff's Fourth Amendment claims are dismissed. Plaintiff's Fourteenth Amendment claim and state law assault and battery claims will go forward. Plaintiff's claims against the John Doe Defendants are dismissed without prejudice. The Court will hold a conference on October 30, 2017, at 2:00 PM to discuss the status of the case. The Clerk of Court is respectfully directed to terminate the pending Motions. (*See* Dkt. Nos. 110, 113.)

SO ORDERED.

DATED:    September 26, 2017
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE